UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| PEARL COTTIER and REBECCA THREE STARS, | ) ) ) | Civ.  02-5021-KES |
| Plaintiffs, | ) ) | |
| vs. | ) ) | MEMORANDUM  OPINION AND ORDER |
| CITY OF MARTIN; TODD ALEXANDER, ROD ANDERSON, SCOTT LARSON, DON MOORE, BRAD OTTE, and MOLLY RISSE, in their official capacities as members of the Martin City Council; and JANET SPEIDEL, in her official capacity as Finance Officer of the City of Martin, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiffs allege that the City of Martin Ordinance 122 dilutes the voting strength of Indians by fragmenting the Indian voters into three wards, which has the result and effect of denying the right of Indians to vote on account of race in violation of § 2 of the Voting Rights Act of 1965 (VRA).  This is plaintiffs' "result" claim.  Plaintiffs also allege that Ordinance 122 was enacted and is being maintained with the discriminatory purpose of denying or abridging the right of Indians to vote on account of race or color or membership in a language minority in violation of plaintiffs' rights guaranteed by § 2 of the VRA, as amended, 42 U.S.C. § 1973, and the Fourteenth and

Fifteenth Amendments of the Constitution of the United States.  This is plaintiffs' "intent" claim.

## FACTUAL BACKGROUND

The City of Martin is in Bennett County, which is located in southwestern South Dakota near the Nebraska border.  Bennett County is surrounded to the north and west by the exterior boundaries of the Pine Ridge Indian Reservation and to the east by the Rosebud Reservation.

Martin is a small city, which according to the 2000 census, had a total population of 1078 persons and a voting-age population of 737 persons.  The city covers an area slightly greater than one-half square mile.  The Indian population in Martin is 485, which is 44.71 percent[1] of the total population and 36 percent of the voting-age population according to the 2000 census.

Historically, the residents of the city of Martin have elected a mayor who ran at-large for a two-year term on a non-partisan ballot.  In addition, Martin was divided into three wards, which each elected two city council members to staggered two-year terms on a non-partisan ballot.  The record is unclear as to when the ward lines were initially drawn, but both parties agree the ward

---

[1]  The 2000 Census was the first federal census to allow respondents to identify themselves with more than one racial group.  This court will consider all individuals who identify themselves as Native American, including those who identify with more than one group, in light of the Supreme Court decision in Georgia v. Ashcroft, 539 U.S. 461, 123 S. Ct. 2498, 2507 n.1, 156 L. Ed. 2d 428 (2003).

lines had not changed for at least 47 years.  By 2001, the wards within the city were not within the requisite variation of population.

The Martin City Council has the power and duty under South Dakota law to redistrict ward boundaries following the decennial federal census.  The city contracted with the Black Hills Council of Local Governments (BHCLG) to refigure the wards so as to be in compliance with the one-person-one-vote requirement.  BHCLG initially used incorrect population data when drawing the new wards.  The city council, unaware of the mistake made by BHCLG, adopted the redistricting recommendations submitted by BHCLG in Ordinance 121 on January 16, 2002.

Upon publication of the new boundaries in the local newspaper, plaintiffs suspected that the boundaries were flawed and contacted attorneys for assistance.  The attorneys analyzed Ordinance 121 and concluded that the new ward boundaries were severely malapportioned in violation of the one-person-one-vote principle of the Fourteenth Amendment and that the wards unlawfully fragmented the Indian population in Martin in violation of § 2 of the VRA.  These concerns were communicated to BHCLG by letter dated March 7, 2002, with a copy to Martin's Mayor Bill Kuxhaus.  The City Council requested BHCLG to redraw the wards to correct the one-person-one-vote problem.  A new map was submitted to the City Council.  On March 12, 2002, plaintiffs' attorneys received a copy of the revised redistricting plan drafted by

3

BHCLG.  Plaintiffs believed that this plan did not correct the fragmentation problem, and they communicated that concern to Mayor Kuxhaus in a letter dated March 12, 2002.

The City Council, although aware of plaintiffs' fragmentation concerns, moved ahead with the adoption of the March 8 plan as Ordinance 122.  Like its predecessor plan, Ordinance 122 divides the City into three wards, none of which contains an Indian majority.  The total population and voting-age population (VAP) figures under Ordinance 122 are summarized as follows:

| Ordinance 122 Statistics | | | | | | |
|---|---|---|---|---|---|---|
| Ward | Total Population | Indian Population | Percent Indian | VAP | Indian VAP | % Indian VAP |
| 1 | 352 | 165 | 46.88% | 236 | 90 | 38.14% |
| 2 | 361 | 177 | 49.03% | 237 | 86 | 36.29% |
| 3 | 365 | 143 | 39.18% | 264 | 90 | 34.09% |

Ordinance 122 took effect on May 8, 2002, and is the plan currently in effect in Martin.  A map of the adopted Ordinance 122 follows as Figure 1.

4



Indian voters submitted a petition to have Ordinance 122 referred to the voters as a ballot issue.  City Finance Officer Janet Speidel reviewed the petition and determined that the petition did not have enough valid signatures, but waited to notify those submitting the petition of the defect until the deadline for petitioning for ballot initiatives had passed.

Plaintiffs brought suit on April 3, 2002, alleging that Ordinance 121 violated the one-person-one-vote requirement under the Equal Protection Clause of the Fourteenth Amendment.  After trial, the court dismissed the complaint as moot.  The court found that Ordinance 121 had been repealed by Ordinance 122, which equally redistributed the population into three wards, and that plaintiffs no longer had an interest in an actual ongoing case

5

or controversy.  Plaintiffs then moved to supplement or amend their complaint to include the allegations currently pending before the court regarding Ordinance 122.  The court granted plaintiffs' motion to supplement their complaint.

Following an eleven-day court trial, the court issued findings of fact and conclusions of law.  (Docket 371).  The court found that plaintiffs failed to prove by a preponderance of the evidence that the third Gingles precondition was satisfied.  As a result, the court concluded that plaintiffs cannot prevail on their "effects" claim.  The court also found that plaintiffs could not prevail on their "intent" claim because the court found that there was no evidence that Ordinance 122 was adopted with discriminatory intent, and because plaintiffs' failure to prevail on their "effects" claim prevents them from prevailing on their "intent" claim.

Plaintiffs appealed to the Court of Appeals for the Eighth Circuit. Cottier v. City of Martin, 445 F.3d 1113 (8th Cir. 2006).  The Eighth Circuit held that the court erred in finding that the third Gingles precondition was not satisfied, and it found that plaintiffs met all three Gingles preconditions and remanded the case to the district court to determine based upon the totality of the circumstances whether Ordinance 122 had a discriminatory effect.  Id. at 1122.  Regarding plaintiffs' "intent" claim, the Court of Appeals

6

affirmed the court's finding that there was no evidence of discriminatory intent in passing Ordinance 122.  Id. at 1121 n.6.

## DISCUSSION

Section 2 of the Voting Rights Act of 1965, as amended, prohibits the use of any voting practice which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority.  42 U.S.C. §§ 1973(a), 1973b(f)(2); Thornburg v. Gingles, 478 U.S. 30, 44, 106 S. Ct. 2752, 2763, 92 L. Ed. 2d 25 (1986).  A violation of § 2 is established "if, based on the totality of the circumstances, it is shown that . . . [members of a protected minority group] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b).  The voting strength of a politically cohesive minority group can be diluted either "by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door."  Johnson v. De Grandy, 512 U.S. 997, 1007, 114 S. Ct. 2647, 2655, 129 L. Ed. 2d 775 (1994).  Both the dispersal of Indians into districts in which they constitute an ineffective minority of voters or the concentration of Indians into districts where they constitute an excessive

majority may dilute racial minority voting strength.  <u>Voinovich v. Quilter</u>, 507

U.S. 146, 154, 113 S. Ct. 1149, 1155, 122 L. Ed. 2d 500 (1993).

The Supreme Court has established a test to prove vote dilution through

the use of multimember districts under § 2 of the VRA:

> First, the minority group must be able to demonstrate that it is
> sufficiently large and geographically compact to constitute a
> majority in a single-member district. . . . Second, the minority
> group must be able to show that it is politically cohesive. . . .
> Third, the minority must be able to demonstrate that the white
> majority votes sufficiently as a bloc to enable it–in the absence of
> special circumstances, such as the minority candidate running
> unopposed–usually to defeat the minority's preferred candidate.

<u>Gingles</u>, 478 U.S. at 51, 106 S. Ct. 2752.  The Eighth Circuit found on appeal

"that the plaintiffs met, by a preponderance of the evidence, all three <u>Gingles</u>

preconditions."  <u>Cottier</u>, 445 F.3d at 1122.

Upon satisfying these three <u>Gingles</u> preconditions, the court must then

consider the totality of the circumstances "to determine, based upon a

searching practical evaluation of the past and present reality whether the

political process is equally open to minority voters.  This determination is

peculiarly dependent upon the facts of each case and requires an intensely

local appraisal of the design and impact of the contested electoral

mechanisms." <u>Gingles</u>, 478 U.S. at 78, 106 S. Ct. 2752.  The Eighth Circuit

remanded this matter to this court to conduct the totality of the

circumstances analysis.

8

Although satisfaction of the three Gingles preconditions "takes the plaintiffs 'a long way towards showing a section 2 violation," Bone Shirt v. Hazeltine, 461 F.3d 1011, 1021 (8th Cir. 2006) (quoting Harvell v. Blytheville Sch. Dist. No. 5, 71 F.3d 1382, 1390 (8th Cir. 1995)), the court still must engage in a searching analysis based upon the totality of the circumstances to determine whether members of the protected minority group have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." See Bone Shirt, 461 F.3d at 1021; see also 42 U.S.C. § 1973(b).  According to the Supreme Court, the district courts should consider the following "Senate" factors during the totality of the circumstances analysis:

> (1) the history of voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the state or subdivision is racially polarized; (3) the extent to which the state or subdivision has used voting practices or procedures that tend to enhance opportunities for discrimination against the minority group; (4) whether minority candidates have been denied access to any candidate-slating process; (5) the extent to which minorities have borne the effects of past discrimination in relation to education, employment, and health; (6) whether local political campaigns have used overt or subtle racial appeals; (7) the extent to which minority group members have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group; and (9) whether the policy underlying the use of voting qualifications is tenuous.

Cottier, 445 F.3d at 1122 (internal quotation omitted); see also Gingles, 478 U.S. at 36-37, 106 S. Ct. 2752.  Proportionality is another factor that may

9

affect the totality of the circumstances analysis.  See Johnson, 512 U.S. at
1020 & n.17, 114 S. Ct. 2647.  "Two factors predominate the totality-of-
circumstances analysis: the extent to which voting is racially polarized and
the extent to which minorities have been elected under the challenged
scheme."  Bone Shirt, 461 F.3d at 1022; see also Cottier, 445 F.3d at 1122.

### 1.    History of Voting-Related Discrimination

According to the first Senate factor, the court considers "the extent of
any history of official discrimination in the state or political subdivision that
touched the right of the members of the minority group to register, to vote, or
otherwise participate in the democratic process."  Bone Shirt, 461 F.3d at
1021.

> Without a doubt a history of discrimination against a minority is
> important evidence of both discriminatory intent and
> discriminatory results.  A history of pervasive, purposeful
> discrimination may provide strong circumstantial evidence . . . (1)
> that present day acts of elected officials are motivated by the
> same purpose, or by a desire to perpetuate the effects of that
> discrimination, (2) that present day ability of minorities to
> participate on an even footing in the political process has been
> seriously impaired by the past discrimination, and (3) that past
> discrimination has also led to present socio-economic
> disadvantages, which in turn reduces participation and influence
> in political affairs.

Buckanaga v. Sisseton Indep. Sch. Dist. No. 54-5, S.D., 804 F.2d 469, 474 (8th
Cir. 1986).  The first Senate factor does not focus on present discrimination;
instead the court must consider "the vestiges of discrimination which may

interact with present political structures to perpetuate a historical lack of access to the political system." <u>Westwego Citizens for Better Gov't v. City of Westwego</u>, 872 F.2d 1201, 1211-12 (5th Cir. 1989) (Westwego I), <u>cited with approval by</u> <u>Bone Shirt</u>, 461 F.3d at 1022.

There is a long, elaborate history of discrimination against Indians in South Dakota in matters relating to voting in South Dakota.  <u>See</u> <u>Buckanaga</u>, 804 F.2d at 474 (noting evidence of South Dakota's history of discrimination against Indians in matters related to voting); <u>Bone Shirt v. Hazeltine</u>, 336 F. Supp. 2d 976, 1019-23 (D.S.D. 2004), <u>aff'd</u>, 461 F.3d 1011 (8th Cir. 2006) (detailing the lengthy history of official discrimination by the State of South Dakota against Indians in the areas of voting and representation).  For example, "South Dakota officially excluded Indians from voting and holding office until the 1940s."  The court in <u>Bone Shirt</u> also noted several instances of more recent discrimination against Indians by both the State of South Dakota and political subdivisions within South Dakota.  <u>Id.</u> at 1023-26.  The same evidence of discrimination was presented in both <u>Bone Shirt</u> and this case.  <u>Compare</u> Ex. 185 <u>with</u> Ex. 564.[2]  As a result, the court incorporates the

---

[2] The court notes that the city of Martin is within the legislative districts that were in dispute in <u>Bone Shirt</u>.

detailed description of discrimination against Indians in South Dakota touching the right to vote and participate in politics as set forth in Bone Shirt.

Dr. Daniel McCool, one of plaintiffs' experts, also provided a report detailing the history of official acts by the State of South Dakota seeking to prevent Indians from exercising their right to vote. Ex. 185. As the court indicated in its previous memorandum, it finds that Dr. McCool is qualified as an expert, and that McCool's report provides a reliable and credible discussion of the history of discrimination against Indians regarding the right to vote.

Like South Dakota, Bennet County also has a history of racial discrimination affecting Indian's participation in the political process. For instance, Indians have had difficulty registering to vote in Bennett County. In Bone Shirt, 336 F. Supp. 2d at 1025, the court detailed the difficulty Indians had obtaining voter registration cards from the Bennett County Auditor. The court incorporates those findings here.

Relying on National Association for the Advancement of Colored People, Inc. (NAACP) v. City of Niagara Falls, New York, 913 F. Supp. 722 (W.D.N.Y. 1994) (NAACP), aff'd, 65 F.3d 1002 (2d Cir. 1995), defendants argue that this evidence of discrimination in South Dakota and Bennett County is irrelevant because it does not focus specifically on the City of Martin. In NAACP, plaintiffs challenged the at-large method of electing city council members for

the City of Niagara Falls as violative of § 2 of the VRA.  Plaintiffs presented expert testimony that detailed the history of discrimination regarding participation in the political process in the State of New York as a whole.  The court gave little weight to the expert's opinions for three reasons: (1) the expert's analysis stopped at 1980; (2) the court questioned the expert's reliance upon interviews to support her conclusions; and (3) the evidence of discrimination related to the State of New York rather than specifically to the City of Niagara Falls.

The court disagrees that NAACP makes the evidence of discrimination relating to voting in South Dakota and its other political subdivisions per se irrelevant to whether Martin also exhibits a similar history of discrimination. Instead, in some circumstances, a history of state-wide discrimination may be relevant.  See Westwego Citizens for Better Gov't v. City of Westwego, 946 F.2d 1109, 1121-22 (5th Cir. 1991) (Westwego III); see also United States v. Blaine County, Mont., 363 F.3d 897, 913 (9th Cir. 2004).  In Westwego III, plaintiffs challenged the structure of the city government as violative of § 2.  The district court found that Louisiana and Jefferson Parish both exhibited a long history of racial discrimination touching voting and participation in the political process.  Nevertheless, the district court found that plaintiffs had presented

no evidence of discrimination in Westwego, and thus, this factor weighed in favor of defendants.

The Court of Appeals for the Fifth Circuit held that this finding was clearly erroneous because the district court found other evidence of discrimination in Westwego itself.  The district court found that a large socioeconomic gap existed between whites and minorities in Westwego, that much of the housing in Westwego was racially segregated, and that minorities were excluded from civic organizations that played important roles in Westwego's political life.  Based thereon, the district court explicitly found that " '[t]here is substantial evidence that blacks in Westwego continue to bear the effects of discrimination,' " and that " 'Westwego is not an island in itself in the history of Louisiana in terms of discrimination.' "  Id. at 1121, 1222 (alteration in original).  The Fifth Circuit concluded that these findings were inconsistent with the district court's finding that plaintiffs had presented no history of discrimination in Westwego limiting minority access to the political system.  Id. at 1122.  In essence, the Fifth Circuit concluded that a history of discrimination touching the right to vote in Louisiana and Jefferson Parish was not only relevant but, when considered with other evidence of racial discrimination in Westwego itself, proved a history of discrimination in

Westwego that "combined with the existing political structures in Westwego to 'perpetuate a historical lack of access to the political system.' " Id.

Like Westwego, the court finds that the City of Martin is "not an island" in the history of discrimination in South Dakota.  First, as discussed more fully below, Indians in Martin continue to suffer the effects of past discrimination, including lower levels of income, education, home ownership, automobile ownership, and standard of living.  See infra ¶ 5.

Second, Russell Waterbury, the former sheriff of Bennett County and a former resident of Martin, testified that "there's really not much difference in terms of politics between what goes on in Bennett County as a whole and what goes on in Martin."  T.VIII., p. 1564.

Third, several residents of Martin testified that they felt discriminated against when attempting to vote.  For instance, Pearl Cottier testified that she personally felt intimidated when attempting to vote because there were no Indian poll workers.  T.I., p. 251.  Alice Young also testified that Indians felt uncomfortable and unwelcome when voting in Martin.  T.III., p. 538.  Between 1980 and 2002, 107 poll watchers worked the 14 municipal elections.  Ex. 257.  Only 10 of those poll watchers were Indian.  Ex. 258.  Additionally, in 7 of the 14 elections, all the poll watchers were white.

Fourth, evidence indicates that Martin city officials have taken intentional steps to thwart Indian voters from exercising political influence.  In 2002, Bob Fogg, an Indian, tried to file a petition that would have referred Ordinance 122 to a public vote.  Fogg turned the petition in to Martin Finance Officer Speidel on April 29, 2002.  T.X., p. 2172.  Although Speidel determined that the petition did not have enough signatures by the end of the day, she did not inform Fogg until after the deadline for filing the petition.  T.X., p. 2175, 2177.  Speidel also testified that she usually tells the person submitting a nominating petition if the petition lacks sufficient signatures.  T.X., p. 2175 The court finds that this is an intentional act by a Martin city official seeking to prevent voters, and in particular Indians who were negatively affected by Ordinance 122, from deciding whether Ordinance 122 should be enforced.

Fifth, like Westwego, Martin has a civic organization—the commercial club—that is politically active.  Although the commercial club does not explicitly exclude Indians, Indians are significantly under represented in the commercial club.  Monica Drapeaux, an Indian business owner, testified that even though she paid her dues, she was not an active member of the commercial club.  T.II., 299-301.  Drapeaux also testified that Indians comprised only 2 or 3 percent of the commercial club and that Indians were under represented.

16

Sixth, there is history of discrimination in lending in Martin.  In 1993, the United States filed a lawsuit against Blackpipe State Bank, which is located in Martin, alleging that Blackpipe State Bank discriminated against Indians in violation of the Equal Credit Opportunity Act and Title VIII of the Civil Rights Act.  Ex. 147.  The case was settled through a consent decree.  Ex. 149.  Although Blackpipe State Bank denied the allegations, it agreed, among other things, to end its explicit policy of refusing to make secured loans subject to tribal court jurisdiction and to provide compensation of not more than $125,000 to each person adversely affected by its policies and practices.  Id.  Drapeaux, a successful business woman, testified that she was refused several loans by Blackpipe State Bank, that other banks located farther away readily loaned her the money, and that white people with weaker financial credentials obtained loans.  T.II., p.312-15.

Seventh, the controversy surrounding a Martin high school homecoming ceremony involving Indian dresses and headdresses is additional evidence of racial discrimination.  As discussed by the court in Bone Shirt, 336 F. Supp. 2d at 1033, some Indians found that ceremony offensive and tried to end the ceremony.  This led to a public forum in 1995 and many whites did not want to change the ceremony.  The ceremony was finally abolished in 1996 to satisfy Indian objections.  See id.

17

Based on the foregoing discussion of racial discrimination in Martin, the court finds that Martin is "not an island" separate from the history of discrimination in South Dakota and Bennett County.  As a result, the court finds that plaintiffs have established that South Dakota, Bennett County, and Martin all have a history of discrimination against Indians that touches Indians' ability to register, to vote, and to actively participate in the political process.  See Westwego III, 946 F.2d at 1121-22.  The court finds that the first Senate factor weighs in favor of plaintiffs.

**2.     Racially Polarized Voting**

The second Senate factor considers "the extent to which voting in the elections of the state or political subdivision is racially polarized." Bone Shirt, 461 F.3d at 1021.  Racially polarized voting exists "where there is a consistent relationship between [the] race of the voter and the way in which the voter votes . . . or to put it differently, where [minority] voters and white voters vote differently." Gingles, 478 U.S. at 54 n.21, 106 S. Ct. 2752 (internal quotation omitted) (first alteration in original); see also League of United Latin Am. Citizens, Council No. 4434 v. Clements, 986 F.2d 728, 748 (5th Cir. 1993) (LULAC).  This is one of the two most important Senate factors in the totality of the circumstances analysis.  See Gingles, 478 U.S. at 49 n.15, 106 S. Ct. 2752; see also Harvell, 71 F.3d at 1390.

18

The court finds that there is a persistent and unacceptable level of racially polarized voting in the City of Martin.  The court begins its analysis with Martin aldermanic elections because these elections are the most probative.  See Bone Shirt, 461 F.3d at 1022 & n.10 (suggesting that elections for posts subject to the challenged districting plan are most probative).  The Eighth Circuit on appeal explicitly found that since adoption of Ordinance 122, the Indian-preferred candidate has lost in every aldermanic election.  See Cottier, 445 F.3d at 1122.

The Eighth Circuit also concluded that the 2003 exit poll performed by Dr. Steven Cole revealed racially polarized voting.  See Cottier, 445 F.3d at 1122.  Among other races, the exit poll covered the aldermanic election in wards I and III.  According to the poll results, 100 percent of Indians supported the Indian-preferred candidate in the ward I election.  Ex. 188, at 10.  Despite overwhelming Indian support, the Indian-preferred candidate lost.  The maximum number of whites that voted for the Indian-preferred candidate was 25 percent,[3] indicating a high degree of polarization.  The exit

_____

[3] Dr. Cole acknowledges that the small number of white voters that responded to his exit poll prevented him from accurately predicting the level of white-crossover support for Indian-preferred candidates.  Dr. Cole can, however, predict the maximum level of white-crossover support.  Dr. Cole knows the number of votes that each candidate received as well as the number of white voters in the election.  Therefore, to calculate the maximum white-crossover, he took the total number of votes that the Indian-preferred candidate received, subtracted the number of votes for that candidate reported

poll results for the ward III City Council race indicates that the Indian-preferred candidate lost despite receiving 85.7 percent of the Indian vote.  Ex. 188, at 11.   The maximum level of white voters who voted for the Indian-preferred candidate was 36.7 percent.  Ex. 188, at 12.  The court finds that the exit polls in the 2003 aldermanic election, along with the loss of every Indian-preferred candidate since adoption of Ordinance 122, strongly indicates racially polarized voting in endogenous elections.

Although it is less probative than the aldermanic elections, the exit poll for the 2003 school board election also indicates voting was racially polarized.  According to poll results, the two Indian-preferred candidates received 82.7 percent and 58.8 percent of the Indian vote.  Ex. 188, at 8.  These candidates finished fourth and fifth respectively out of six candidates.  The maximum white-crossover for the Indian-preferred candidates was 14.6 percent and 6.3 percent respectively.  Ex. 188, at 9.

Dr. Cole's statistical analysis of exogenous elections also indicates racially polarized voting.  Dr. Cole employed the ecological inference (EI) or the King method to estimate racial bloc voting in Martin.  Ex. 186, at 12.  Dr. Cole

---

by Indian participants in the exit poll, and then assumed that all other votes received by the Indian-preferred candidate were white-crossover votes.  This enabled him to calculate the maximum level of white-crossover support for the Indian-preferred candidate.  In doing so, Dr. Cole's survey likely underestimated racial polarization because it presumed that every Indian who did not participate in the exit poll voted against the Indian-preferred candidate.

applied this technique to federal, state, and county elections between 1996 and 2002.  Dr. Cole could not apply his statistical analysis to the endogenous elections, however, because there were too few precincts involved in the elections.  In its previous order, the court fully explained Dr. Cole's technique and found his statistical analysis scientific, reliable, and credible.  (Docket 371, at 23-27).  The court incorporates those findings here.

According to Dr. Cole, racial polarization exists in contests involving two candidates "when a majority of the voters of one race would elect a different candidate than would the majority of voters of the other race. . . .  In head to head contests with more than two candidates, significant racial polarization is exhibited when a majority/plurality of the voters in one race would elect a different candidate than would a majority/plurality of voters of the opposite race." Ex. 186, at 6.  Based on this definition and his statistical analysis, Dr. Cole opined that voting in the City of Martin was polarized in 6 out of 7 (85.7 percent) interracial, head-to-head, exogenous contests.  Ex. 186, at 25. The average level of white support for Indian-preferred candidates in these six racially polarized elections was only 11 percent.  Ex. 186, at 25.  In non-interracial contests, Dr. Cole opined that voting was racially polarized in Martin in 24 of 28 (86 percent) exogenous, head-to-head elections.  Ex. 186, at 26.  The average white support for Indian-preferred candidates in these

racially polarized elections was 29 percent.  Ex. 186, at 26.  As further

indication of racial polarization, Dr. Cole noted that white-crossover voting

decreases from 29 percent to 11 percent whenever there is an Indian

candidate in the field.  Ex. 186, at 27.

Dr. Ronald E. Weber, defendants' expert, replicated Dr. Cole's EI

analysis of voting in Martin.  Dr. Weber's statistics indicate that voting in

Martin was racially polarized in 6 of 7 (85.7 percent) of the interracial, head-

to-head, exogenous elections.  Ex. 450, Table 3.  Voting was racially polarized

in 24 of 28 (85.7 percent) non-interracial, head-to-head, exogenous elections.

Ex. 450, Table 4.  This further supports a finding that elections in the City of

Martin are racially polarized to a high degree.

Dr. McCool's report also supports a finding of racially polarized voting in

Martin.  According to Dr. McCool, the history of racial tension between

Indians and whites has created "an 'us-versus-them' political environment."

Ex. 185, at 45.  Although Dr. McCool was referring to the general political

arena in South Dakota, the City of Martin, as discussed above, has a similar

history of racial discrimination.  Dr. McCool's observation that a history of

racial discrimination has led to racially polarized voting would likely apply to

the City of Martin.  And in fact, the foregoing statistics reveal racially polarized

voting.

The testimony of several lay witnesses further indicates racially polarized voting.  For instance, Susan Williams, the Bennett County Auditor, admitted that "in recent elections in Bennett County and in Martin, there has been an Indian versus white mentality[.]"  T.X., p. 2229.  Pearl Cottier testified that white and Indian voters are separated, and that white voter turnout in Martin increases whenever an Indian candidate runs for office.  T.I., p. 252.

Defendants argue that there is no racially polarized voting in the City of Martin.  Instead, defendants cite to testimony allegedly indicating that the "us-versus-them" mentality actually refers to the division between Indian members of the LaCreek Civil Rights Group and other Indians who live in Martin.  The court finds, however, that this testimony indicates that not all Indians are members of the LaCreek Civil Rights Group, and that Indians disagree with other Indians on some issues.  Further, even if this testimony indicated that voting was not polarized in Martin, the court would find it incredible because it conflicts with the statistical evidence, which shows overwhelming levels of racially polarized voting.

Defendants also suggest that partisanship rather than race drives the racially polarized voting in the City of Martin.  Specifically, defendants note that most Indians vote democrat, and this political affiliation explains the divergent voting patterns between whites and Indians in Martin.  The court

disagrees.  The court finds that partisanship has no effect on the racially

polarized voting indicated in Martin aldermanic elections held under

Ordinance 122 because these elections are nonpartisan.  As a result, even if

partisanship could explain the racially polarized voting in the partisan,

exogenous elections discussed above, it does not explain the racially polarized

voting that exists in the most probative elections, namely those held for

Martin City Council under Ordinance 122.  See Bone Shirt, 461 F.3d at 1022

& n.10.

In sum, the court finds that the overwhelming statistical evidence

establishes that racially polarized voting exists in Martin.  This finding is

further supported by testimony describing an "us-versus-them" mentality in

the Martin.  The court thus finds that the second Senate factor weighs heavily

in favor of plaintiffs.

### 3.   Voting Practices or Procedures That Tend to Enhance Opportunities for Discrimination

The third Senate factor requires the court to determine "the extent to

which the state or political subdivision has used unusually large election

districts, majority vote requirements, anti-single shot provisions, or other

voting practices or procedures that may enhance the opportunity for

discrimination against the minority group."  Bone Shirt, 461 F.3d at 1021.

Staggered terms can further dilute the voting power of minorities because

"they limit the number of seats, create more head-to-head contests between white and minority candidates, which highlight the racial element and minimize the influence of single-shot voting." Buckanaga, 804 F.2d at 475 (citing City of Rome v. United States, 446 U.S. 156, 185 & n.21, 100 S. Ct. 1548, 1565, 1566 n.21, 64 L. Ed. 2d 119 (1980)); see also Blaine County, Mont., 363 F.3d at 913 & n.25 (staggered terms prevent single-shot voting).

The aldermanic elections in Martin utilize staggered terms.  The court finds that these staggered terms increase the likelihood of head-to-head races for City Council.  Further, because whites are a majority in each district and the white voters vote cohesively, staggered terms enable the white voters to elect their candidate of choice in these head-to-head races.  See Buckanaga, 804 F.2d at 475 ("[A] staggered term requirement combined with a white majority and white block voting places a minority at a severe disadvantage.").  The staggered terms also work to prevent single-shot voting by Indians.  In fact, Dr. Ronald Weber, a defense expert, testified that the staggered terms used by Martin "are an anti-single shot provision."  T.VI., p. 1079-80.

The court also finds that the majority vote requirement previously imposed on Martin aldermanic elections enhanced the opportunity for discrimination against the minority group.  The majority vote requirement prevents an Indian-preferred candidate with a plurality of the votes from winning if multiple white-preferred candidates split the white vote.  Instead of

25

a plurality winner, the majority vote requirement requires a head-to-head, run-off election, which again favors whites who are the majority group in each ward. The vast evidence of racially polarized voting in Martin indicates that Indian-preferred candidates in head-to-head races will seldom prevail. This is further supported by the fact that since adoption of Ordinance 122, every Indian-preferred candidate in a contested election for the City Council has lost.

Defendants note that Martin no longer requires a majority vote requirement. The testimony of Brad Otte indicates that the Martin City Council passed an ordinance to permit a win by plurality vote in elections for City Council. T.IX., p. 1935-36. Although the court agrees that this alleviates some of the risk of diluting the minority vote, the court finds that under the circumstances of this case, and in particular the evidence of racially polarized voting, staggered terms alone work to dilute the Indian vote. See Buckanaga, 804 F.2d at 475. Without the majority vote requirement, however, the court finds that the third Senate factor only weighs slightly in favor of plaintiffs.

### 4.    Denial of Access to Candidate-Slating Process

The fourth Senate factor requires the court to determine "if there is a candidate-slating process, whether the members of a minority group have been denied access to that process." Bone Shirt, 461 F.3d at 1021. A slating process exists when "some influential non-governmental organization selects

26

and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected." Westwego III, 946 F.2d at 1116 n.5; see also Reed v. Town of Babylon, 914 F. Supp. 843, 887 (E.D.N.Y. 1996).

Plaintiffs concede that there is no formal slating process for Martin City Council.  Instead, plaintiffs argue that the commercial club, which they claim excludes Indians, acts as an informal slating process.  The court finds, however, that the evidence does not support this contention.  At most, the evidence indicates that some members of the commercial club are community leaders, and that the commercial club sometimes concerns itself with local politics.  T.II., p. 300, 304-07; T.III., p. 555.  In fact, Drapeaux, an Indian member of the commercial club, described the club as "just a group of merchants, local merchants, that organize and promote retail business."  T.II., p. 299.  There is simply no evidence indicating that the commercial club determines who wins aldermanic elections.

Plaintiffs also suggest that the Bennett County Democratic Committee acts as a slating process.  Plaintiffs point to an instance where the Bennett County Democratic Committee supported a slate of independent candidates for elected positions in Bennett County after several Indians won the democratic primary for those positions.

27

Although local political parties can act as slating processes, see Goosby v. Town Board of the Town of Hempstead, New York, 180 F.3d 476, 496-97 (2d Cir. 1999), there is no evidence in this case that the Bennett County Democratic Committee determined who would win municipal elections.  The municipal elections in Martin are non-partisan.  Ex. 448, at 11.  Further, the Bennett County Democratic Committee's support of slate of independent candidates was for county, not municipal, offices.  As such, the court finds that the Bennett County Democratic Party is not an informal slating process for Martin aldermanic elections.

Finally, plaintiffs suggest that Indians have difficulty being elected in municipal elections because Indians are under represented in municipal appointments and because racial discrimination makes campaigning difficult in Martin.  These instances do not, however, constitute an informal slating process.  See Westwego III, 946 F.2d at 1116 n.5.

In sum, the court finds that there is no formal or informal slating process for candidates seeking election to the Martin City Council.  As a result, this Senate factor weighs in favor of defendants.

### 5.    Effects of Past Discrimination in Education, Employment, and Health

The fifth Senate factor requires the court to determine "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and

28

heath, which hinder their ability to participate effectively in the political

process." <u>Bone Shirt</u>, 461 F.3d at 1011.  The Senate Report accompanying

amendment of § 2 of the VRA explains the rationale and the nature of the

inquiry for this factor:

> [D]isproportionate educational, employment, income level and
> living conditions arising from past discrimination tend to depress
> minority political participation.  Where these conditions are
> shown, and where the level of black participation in politics is
> depressed, plaintiffs need not prove any further causal nexus
> between their disparate socio-economic status and the depressed
> level of political participation.

S. Rep. No. 97-417 (1982), <u>reprinted in</u> 182 U.S.C.C.A.N. 177, 206 n.114

(hereinafter referred to as Senate Report).  "[P]olitical participation by

minorities tends to be depressed where minority group members suffer effects

of prior discrimination such as inferior education, poor employment

opportunities, and low incomes." <u>Gingles</u>, 478 U.S. at 69, 106 S. Ct. 2752.

Under this factor, plaintiffs are not required to prove that racial

discrimination or disparities caused, in whole or in part, depressed levels of

minority political participation.  <u>See United States v. Marengo County</u>

<u>Comm'n</u>, 731 F.2d 1546, 1569 (11th Cir. 1984).  Rather, the burden is on

"those who deny the causal nexus to show that the cause is something else."

<u>Id.</u>  <u>See Whitfield v. Democratic Party of State of Ark.</u>, 890 F.2d 1423, 1431

(8th Cir. 1989).  The disparities are the effects of discrimination to which the

Senate factor refers.  <u>Harvell</u>, 71 F.3d at 1390.  A court must specifically

address evidence of discrimination against Indians and "any lingering effects of discrimination as evidenced by economic and social disparity between Indians and whites and the effect of this discrimination and disparity upon Indian political participation." Buckanaga, 804 F.2d at 474-75.

The Eighth Circuit has explicitly recognized that Indians in South Dakota continue to bear the burdens of past discrimination, which hinders their ability to participate in politics. In Bone Shirt, the Eighth Circuit noted the history of discrimination against Indians in South Dakota and stated that "the historic effects of discrimination in the areas of health, employment, and education impact negatively on the ability of Indians to participate in the political process." Bone Shirt, 461 F.3d at 1022 (internal quotation omitted); see also Buckanaga, 804 F.2d at 474-75 (noting that substantial evidence indicated economic disparities between Indians and whites in South Dakota and that a lesser percentage of Indians were registered to vote when compared to whites).

The court finds that Martin is no different. The Summary File 3 (SF3) from the 2000 census contains socioeconomic data produced by the United States Census Bureau. SF3 is created by responses to the 2000 census long form. T.II., p. 437. Only one in six people receive a long form. T.II., p. 437. SF3 assigns respondents to racial categories using the single-race method only. Ex. 180, at 21.

30

SF3 indicates that Indians in Martin bear the effects of past discrimination in the area of education.  Of the Indians 25 years of age or older in Martin, 36.4 percent have not finished high school, whereas only 16.1 percent of their white counterparts have not finished high school.  Ex. 180, at 22.  The dropout rate among Indians between the ages of 16 and 19 is 21.4 percent, whereas only 3.4 percent of whites dropout.  Id.  Only 9.7 percent of Indians over the age of 25 have a bachelor's decree or higher, whereas 20.3 percent of whites have received at least a bachelor's degree.  Id.

Past discrimination also affects the employment and income levels of Indians in Martin.  According to SF3, in 2000, the unemployment rate of Indians was 15.8 percent.  Ex. 180, at 22.  This is over five times higher than the rate for whites—3 percent.  Id.  The median family income for Indian households in Martin was $20,972, and 35.5 percent reported income below $10,000.  Ex. 180, at 23.  The median family income for white households was $45,714 and only 14.6 percent reported household income below $10,000.  Id. 44 percent of Indians lived below the poverty rate, which is over four times higher than the number of whites (10 percent).  Additionally, at least 40 percent of Indian children lived in poverty, while no white children were living in poverty.  Id.  Finally, the median level of earnings for an Indian person working full time in 1999 was $19,808; the median level of earnings for a white worker was $26,944.

31

Decreased earnings and employment are further illustrated in the level of home ownership.  Compared to whites (31.2 percent), twice as many Indians (62.6 percent) rented their homes.  Ex. 180, at 22.  Of those that rented, 26.8 percent of Indians paid more than half of their income to rent, compared to only 10.6 percent of whites.  The value of homes owned by Indians was also substantially lower.  The median home value for Indian owners was $9,999, whereas the median home value for white owners was $39,9000.  Id.  Further, 18.2 percent of Indian homes in Martin lacked telephones and 17.2 percent lacked access to a car.  Ex. 180, at 23-24.  Only 1.1 percent of white households were without a phone and 7.2 percent lacked access to a car.  Id.  The foregoing is overwhelming evidence indicating that burdens of discrimination still affect the education, employment, and health of Indians in Martin.

Defendants argue that the economic statistics included in SF3 are not reliable because the small number of households in Martin creates a large sampling error.  Although a sampling error exists, the court finds that the statistics are sufficiently reliable.  More important than a precise determination of the education or income levels of Indians in Martin is the trend that whites are generally better off.  In any event, the court finds that the statistics contained in the SF3 indicate such a wide disparity between whites and Indians that the sampling error has little, if any, effect on the

general relationship between whites and Indians.  This disparity is further supported by the SF3 statistics for Bennett County, which because of its larger population, has a smaller risk of sampling error.  Like Martin, the Bennett County statistics indicate that as a group Indians lag significantly behind whites.  Ex. 180, 24-26.

Defendants also point to Dr. Weber's testimony indicating that the economic disparity between Indians and whites is not as severe as indicated by the SF3 statistics because SF3 fails to account for the earned income credit obtained by some impoverished people and various subsidies or government programs such as housing subsidies, Medicaid, or the provision of health benefits by Indian Health Services.  T.V., p. 1008-09.  There is no evidence, however, indicating how much, if any, these additional sources of income would decrease the economic disparity between Indians and whites in Martin. The court thus finds that the SF3 statistics are reliable enough to indicate that whites, as a group, generally have higher levels of income and education when compared to Indians in Martin.

The record also establishes that Indians suffer from depressed participation in the political process.  Dr. Cole was able to determine that 30.7 percent of the voters in the 2003 Martin municipal election were Indian. Ex. 188, at 6.  In 2000, Indians comprised 36 percent of the VAP in Martin. Ex. 180, at 9.  As a result, if Indians were turning out to vote at the same rate

33

as whites, then they should have represented approximately 36 percent of the voters in the 2003 municipal election.  Because they did not, this indicates a higher turnout rate for whites when compared to Indians in Martin.

Further, as discussed above, Indians have been substantially under represented as poll workers in Martin municipal elections.  This absence of Indian poll workers adversely affects Indian participation in voting.  T.III., p. 537.

Dr. McCool also indicated several factors that have contributed to reduced political participation by Indians in Martin, including a "combination of past and present discrimination, resistance to Indian voter registration, a hostile political and social environment, limited reading comprehension and understanding of election laws and precinct boundaries by tribal members, and extreme poverty . . . ."  Ex. 185, at 52.  Dr. McCool also noted that political science literature indicates poverty causes decreased political participation.  Ex. 185, at 52; see also Whitfield, 890 F.2d at 1431 ("Inequality of access is an inference which flows from the existence of economic and educational inequalities." (internal quotation omitted)).

In short, the court finds that Indians continue to suffer the effects of discrimination, including lower levels of income and education.  Additionally, the court finds that Indians in Martin suffer from depressed levels of political activity.  As a result, the fifth Senate factor weighs in favor of plaintiffs.

### 6.     Use of Racial Appeals in Campaigns

The sixth Senate factor requires the court to determine "whether political campaigns have been characterized by overt or subtle racial appeals." Bone Shirt, 461 F.3d at 1022.  Racial appeals occur when either an opponent or the media call attention to the race of one candidate or that candidate's supporters.  See Williams v. City of Dallas, 734 F. Supp. 1317, 1360 n.119 (N.D. Tex. 1990).

Racial appeals have been employed in state elections as well as Bennett County elections.  In 1998, when the democratic nominee for governor picked Elsie Meeks as a running mate, the headline in South Dakota's largest newspaper read "Hunhoff Picks Indian Woman As Running Mate." Ex. 4.  In 2002, several media outlets, including the local newspaper in Martin, ran advertisements suggesting voter fraud by Indians, even though there was no evidence of fraudulent activity.  Ex. 14; Ex. 15; Ex. 16; Ex. 54; Ex. 55; Ex. 102.  Finally, during the 2002 primary and general elections for Bennett County commissioner, some white voters in Bennett County spread rumors indicating that Indian candidates would place deeded land back into trust if elected to the county commission.  T.IX., p. 1910.  Molly Risse testified that racial appeals were also used in the Martin municipal election.  T.VIII., p. 1620.

In sum, the court finds that there is some evidence that racial appeals are used in elections in South Dakota.  The court gives this factor little weight, however, because most of the racial appeals involved elections outside Martin. The court finds that this factor weighs in favor of neither plaintiffs nor defendants.

### 7.    Success of Minority Candidates

The seventh Senate factor requires consideration of "the extent to which members of the minority group have been selected to public office in the jurisdiction." Bone Shirt, 461 F.3d at 1022.  This is one of the two most important factors.  See Harvell, 71 F.3d at 1390.  Nevertheless, "the election of a few minority candidates does not necessarily foreclose the possibility of dilution of the [minority] vote." Clark v. Calhoun County, Miss., 88 F.3d 1393, 1397 (5th Cir. 1996) (internal quotation omitted).

The evidence indicates that Indians have rarely been elected to the Martin City Council.  According to Dr. Weber's report, four Indians have won a total of seven City Council elections between 1981 and 2002 in Martin.  Ex. 448, at 26.  During this time, there have been 29 elections for City Council in ward I.  The only Indians to be elected in ward I were Melva Marshall, who won a contested election in 1984, and Molly Risse, who won a contested election in 2001.  Ex. 448, at 27-29.  Molly Risse, however, was not an Indian-preferred candidate.  T.I., p. 255; T.IV., p. 845-46.  There were 26 elections in

ward II.  The only Indian elected in ward II was Dick Rose, who ran
unopposed in both 1991 and 1993.  Ex. 448, at 31-31.  There have been 26
elections in ward III.  Once again, only one Indian has won election in Ward
III—Greg Claussen, who ran unopposed in 1994, 1995, and 1997.  Thus, out
of 80 elections for Martin City Council, Indians won only 7 elections (8.75
percent).

       Although this evidence indicates that Indian candidates have had some
limited success in seeking election to Martin City Council, on the whole, the
court finds that this success is rare.  Further, in 5 of the 7 successful
elections, the Indian candidate ran unopposed.  Ex. 448, at 27-34.  In 3 of the
5 unopposed successes by Indians, the candidate was an incumbent.  Ex.
448, at 33.  As a result, the court gives little, if any, weight to the 5 elections
in which Indians were elected under "special circumstances."  See Harvell, 71
F.3d at 1389-90 (considering the special circumstances of incumbency and
unopposed elections when discussing minority success).

       Defendants suggest that the fact that some Indian candidates ran
unopposed suggests that Indians have been successful at being elected to City
Council, thereby indicating that Ordinance 122 does not unlawfully dilute the
Indian vote.  The court agrees that evidence that minority candidates run
unopposed may in some instances indicate minority success.  See Jenkins v.
Manning, 116 F.3d 685, 694 (3d Cir. 1997) (stating election between two

minority candidates without a white challenger was evidence of minority success).  Here, however, the court gives little weight to the fact that a few, unopposed Indian candidates were elected to the Martin City Council.  First, the court finds that unopposed Indian candidates can be attributed mostly to Martin's small population rather than white acceptance of Indian candidates.  Testimony indicates that Martin's small population means that there are often very few citizens interested in running for City Council.  T.X., p. 2125.  Second, the court finds that unopposed elections have little probative value on whether Martin's districting plan dilutes the Indian vote by fragmenting Indian voters among the three majority-white wards.  Logically, if unopposed, Indian candidates will win regardless of how much the Indian vote has been diluted.  See Harvell, 71 F.3d at 1389 ("Even in an extreme case of total vote dilution a candidate running in the face of no opposition is ensured success.").

In sum, the court finds that since 1981, only 7 elections for Martin City Council were won by an Indian.  Further, an Indian has only won twice when the election was contested.  And one of the prevailing Indian candidates was not the Indian-preferred candidate in that election.  As a result, the court finds that Indians are rarely elected to the Martin City Council, and that the seventh Senate factor weighs in favor of plaintiffs.

38

### 8.    Lack of Responsiveness

According to the Senate Report, an additional, relevant factor is
"whether there is a significant lack of responsiveness on the part of elected
officials to the particularized needs of the members of the minority group."
Senate Report, 1982 U.S.C.C.A.N. at 207; see also Bone Shirt, 461 F.3d at
1022.  "If the officials are unresponsive it suggests that they are willing to
discriminate against minorities and need not be accountable to minority
interests."  Marengo County Comm'n, 731 F.2d at 1572.  "Unresponsiveness
is not an essential element of plaintiff's case," and thus, a showing of
responsiveness does not bar plaintiffs from proving a § 2 violation.  Senate
Report, 1982 U.S.C.C.A.N. at 207 n.116.

Plaintiffs suggest, and the court agrees, that the adoption of Ordinance
122 indicates a lack of responsiveness to the particularized needs of Indians.
The record indicates that following adoption of Ordinance 121, the ACLU,
acting on behalf of Indians in Martin, contacted Bill Lass of BHCLG.  Ex. 175.
The ACLU informed Lass that Ordinance 121 had two problems: (1) it was
malapportioned; and (2) the district lines violated § 2 of the VRA by
fragmenting Indian voters among the three wards.  Ex. 175; T.VII, p.1378.
Regarding the first problem, Lass worked in conjunction with the Martin City
Council to solve this issue.  Ex. 445.  Ultimately, the malapportionment
problem was solved with the adoption of Ordinance 122.

39

Lass was not hired, however, to fix the § 2 violation.  Ex. 445.  Instead, he suggested that the ACLU direct future contact with the City of Martin.  In response, the ACLU wrote a letter to Mayor Kuxhaus on March 12, 2002.  Ex. 176.  The letter clearly indicated that the ACLU believed that although Lass's new districting proposal solved the malapportionment problem, it continued to violate § 2 of the VRA.  Ex. 176.  The City Council tabled the issue regarding whether Ordinance 121 violated § 2 of the VRA at its March 12, 2002, meeting so that the Martin City Attorney and the South Dakota Attorney General could look at the issue.  T.X., p.2120, 2164-65.  The next City Council meeting was held on March 18, 2002.  T.X., p. 2121.  At the March 18 meeting, the City Council again tabled the § 2 issue.  T.X., p. 2170.  The City Council did, however, adopt Ordinance 122.  T.X., p. 2122.  Before adopting Ordinance 122, the City Council was informed that the South Dakota Attorney General's Office stated that Ordinance 122 fixed the malapportionment problem but as for the § 2 problem, "we don't know what we are going to do about it."  T.IX., p. 1761.  As a result, the court finds that the Martin City Council was aware that Ordinance 122 may violate § 2 when it adopted the ordinance.  T.X., p. 2119, 2161-62.  This disregard for whether Ordinance 122 dilutes the Indian vote indicates a lack of responsiveness to particular Indian needs.

40

Beyond failing to consider whether Ordinance 122 violated § 2 of the VRA, the court finds that Martin Finance Officer Speidel took affirmative steps to prevent voters in Martin, including Indian voters, from deciding whether to adopt Ordinance 122.  Robert Fogg, an Indian, circulated a petition that would have referred Ordinance 122 to a public vote.  Ex. 255; T.VII, p. 1339. Fogg submitted the petition to Speidel on April 29, 2002.  T.X., p. 2172.  That same day, Speidel took Fogg's petition to the county auditor's office and determined that the petition lacked the sufficient number of signatures.  Id. Rather than calling or immediately contacting Fogg, Speidel sent a letter to Fogg informing him about the deficiency.  T.X., p.2177.  Speidel sent this letter after the deadline, and thus, Fogg could not gather additional signatures.  Id.  Speidel admitted that as a common courtesy, she informs someone who submits a nominating petition that the petition lacks sufficient signatures.  The court thus finds that Speidel, while acting as a city official, purposefully acted to impede Fogg in referring Ordinance 122 for a public vote, which further indicates a lack of responsiveness.

The court also finds that Martin's management of its law enforcement contract with the Bennett County Sheriff's Department indicates a lack of responsiveness.  In late 2001 and early 2002, several Indians, including members of the LaCreek Civil Rights Committee, complained to the City Council about the perceived discrimination and mistreatment of Indian people

41

by Russell Waterbury, the Bennett County Sheriff, and his deputies.  T.IV., p. 837-39, 858, 911-12; T.VIII., p.1496-98, 1624, 1728-29; T.IX., p. 1946.  At that time, Martin contracted with the Bennett County Sheriff to provide law enforcement services.  Due to frustration with the sheriff, Indian voters mobilized in 2002 to defeat an incumbent mayor, the sheriff, and two county commissioners.  Ex. 146; T.I., p.262-66; T.IV., p. 839-41, 860-63.  Then, in 2002, after Charlie Cummings, an Indian, was elected as Bennett County Sheriff, Martin terminated its contract with the Bennett County Sheriff's Department to provide law enforcement services.  T.IV., p. 861, 863-64. Martin started its own police department and hired Shane Valandra, one of Russell Waterbury's former deputies, as the new police chief.  T.VII., p. 1416. Testimony indicates, however, that Valandra was unpopular with the Indian community, and that the City was aware of his unpopularity.  T.VII., p. 1348; T.VIII., p1497-98.

Defendants argue that there was nothing they could do about Sheriff Waterbury's actions because he was an elected county official.  The court disagrees.  Although the Martin City Council could not remove the sheriff, it did have a contract with the sheriff's department for the provision of law enforcement services.  Pursuant to this contract, Martin paid for two police cars and two deputies.  T.IV., p. 863. Martin could terminate the law enforcement contract, thereby diminishing the sheriff's department's budget.

The court finds that this empowered the City Council to exert pressure on Sheriff Waterbury.  Indeed, the City Council utilized this power later when it disagreed with the actions of Sheriff Cummings.  T.VII., p. 1412-14.  There is no evidence, however, that the City Council used this power to influence Waterbury as a result of Indian complaints.

There is some evidence indicating that the City Council has responded to some Indian needs.  For instance, Martin provides funding for a powwow each July.  T.VII., p. 1421, 1471; T.VIII., p. 1627.  Martin also provided funding to help build a sidewalk from Sunrise Housing to Martin.  T.VII., p. 1421-22, 1471; T.IX., p. 1994-95.  The court finds that these projects primarily benefitted Indians, and thus, indicate a responsiveness to Indian needs.

Although the evidence is mixed on whether the Martin City Council was responsive to Indian needs, the court finds that this factor weighs slightly in favor of plaintiffs.  As noted, the City Council responded to Indian needs by funding the powwow and the sidewalk.  The court finds, however, that these small benefits are outweighed by the City Council's disregard for the Indian concerns about Ordinance 122 and Sheriff Waterbury.

### 9.    Tenuousness of City's Policy Drawing District Lines

One additional factor that may be relevant is whether "the policy underlying the jurisdiction's use of the current boundaries [was] tenuous."

43

<u>Bone Shirt</u>, 461 F.3d at 1022.  "[T]he tenuousness of the justification for the state policy may indicate that the policy is unfair."  <u>Marengo County Comm'n</u>, 731 F.2d at 1571.  Although the tenuousness of the state's justification for its policy is a relevant consideration in the totality of the circumstances analysis, "'[p]roof of a merely non-tenuous state interest . . . cannot defeat liability.'"  <u>Clark</u>, 88 F.3d at 1401 (quoting <u>League of United American Citizens, Council No. 4434 v. Clements</u>, 999 F.2d 831, 871 (5th Cir. 1993) (alteration in original).

Plaintiffs argue that the Martin City Council has never offered a policy justification for adoption of Ordinance 122.  They further argue that the adoption of Ordinance 122 must be tenuous because the City Council was aware that Ordinance 122 might violate § 2 of the VRA when it adopted it.  The court disagrees.  Martin originally initiated redistricting, which culminated in adoption of Ordinance 121 in January of 2002, pursuant to its obligations following the 2000 census.  T.X., p. 2114.  This redistricting was done to reduce an unacceptable level of variation in population among the three wards.  <u>Id.</u>  Following adoption of Ordinance 121, the City Council learned that Lass had made a mistake in redrawing the three wards.  This mistake resulted in malapportionment.  T.X., p. 2115.  The City Council adopted Ordinance 122 to solve this malapportionment problem.  T.X., p. 2122.  Thus, Martin's policy for adopting Ordinance 122 was to effect

redistricting following the 2000 census and comply with the one-person-one-vote requirement imposed by federal law.

The court also finds that the City Council's knowledge that Ordinance 122 may violate § 2 of the VRA does not make Ordinance 122 tenuously connected to the reason for redistricting. The evidence indicates that a municipal election was impending. As a result, the City Council needed to have a districting plan in place to enable the candidates to circulate nominating petitions. T.VII., p. 1375; T.X., p. 2117. The City Council could not proceed with Ordinance 121, which was currently in effect, because Lass's mistake meant that Ordinance 121 violated the one-person-one-vote requirement. Ex. 175. Thus, the City Council needed to expeditiously adopt a districting policy. It chose to do so by adopting Ordinance 122.

The court also finds that the time constraints imposed by the impending elections limited the City Council's ability to determine whether in fact Ordinance 122 violated § 2 of the VRA. Contrary to plaintiffs' contention, the City Council did not know for sure whether Ordinance 122 violated § 2 when it adopted Ordinance 122 at the meeting held on March 18, 2002. At most, the City Council knew that the ACLU believed that Ordinance 122 violated § 2 and the Martin City Attorney and South Dakota Attorney General's Office were looking at the issue. T.IX., p. 1761. In addition, whether Ordinance 122 violated § 2 presents a complicated, fact-intensive question of law that the

City Council was unable to determine in time to hold the impending municipal election.  Indeed, this exact question has culminated in over four years of litigation, an eleven-day trial, and an appeal.

In sum, the court finds that Ordinance 122 is not tenuously related to the Martin City Council's policy for adopting the ordinance.  As a result, this factor weighs in favor of defendants.

### 10.    Proportionality

The Supreme Court has indicated that proportionality is another relevant factor in determining whether a districting plan violates § 2 of the VRA.  See Johnson, 512 U.S. at 1020-21 & n.17, 114 S. Ct. 2647. Proportionality "links the number of majority-minority voting districts to the minority members' share of the relevant population."  Id. at 1014 n.11, 114 S. Ct. 2647.[4]  Although proportionality provides "an equal opportunity, in spite of racial polarization, 'to participate in the political process and to elect representatives of their choice,' " proportionality is not a safe-harbor that always bars plaintiffs from establishing a § 2 violation.  Id. at 1020, 114 S. Ct.

---

[4] Proportionality as used herein refers to a different concept than proportional representation, which is not a valid consideration in a § 2 analysis.  See 42 U.S.C. § 1973(b) (stating that § 2 does not "establish[ ] a right to have members of a protected class elected in numbers equal to their proportion in the population").  Proportional representation refers to the "success of minority candidates," whereas proportionality refers to "the political or electoral power of minority voters."  Johnson, 512 U.S. at 1014 n.11, 114 S. Ct. 2647.

46

2647 (quoting 42 U.S.C. § 1973(b)).  On the other hand, disproportionality, as one factor in the totality of the circumstances analysis, may indicate a dilution of the minority vote in violation of § 2.  Id. at 1020 n.17, 114 S. Ct. 2647; see also Stabler v. County of Thurston, Neb., 129 F.3d 1015, 1023 (8th Cir. 1997) ("[P]roportionality is a relevant factor to be considered in the totality of the circumstances analysis.").

Here, the court finds that the three-ward system created by Ordinance 122 lacks proportionality.  Indians comprise approximately 45 percent of Martin's population and approximately 36 percent of Martin's VAP.[5]  Ex. 181.  But Indians are not a majority in any of the three wards created by Ordinance 122, however.   Ex. 180, at 15.  If Indians were a majority in one of the three wards, then Martin's districting system would exhibit much more proportionality.  As a result, the court finds that Ordinance 122 is not proportional, and that this factor weighs in favor of plaintiffs.

**CONCLUSION**

After reviewing each of the Senate factors and the other relevant circumstances in this case, the court finds based on the totality of the

---

[5] In Johnson, 512 U.S. at 1017 n.14, 114 S. Ct. 2647, the Supreme Court refrained from deciding whether the proper population for determining proportionality is the minority's percentage of the population or the minority's percentage of VAP.  Like the Supreme Court, the court here refrains from deciding this issue because the court finds that Ordinance 122 lacks proportionality irrespective of which population is used.

circumstances that Ordinance 122 creates a districting plan that fragments Indian voters among all three wards, thereby giving Indians "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973. As a result, the court finds that Ordinance 122 impermissibly dilutes the Indian vote and violates § 2 of the VRA.

Having concluded that Ordinance 122, which is Martin's existing districting plan, violates the Voting Rights Act, plaintiffs are entitled to a full and complete remedy. See Bone Shirt, 336 F. Supp. 2d at 1052-53. Because redistricting is primarily within the province of the state or local government, the court will give defendants the first opportunity to propose a remedy for the § 2 violation in this case. See Voinovich, 507 U.S. at 156, 113 S. Ct. 1149. The court will then review defendants' proposed remedy "to determine whether it is " 'legally unacceptable.' " Cottier, 445 F.3d at 1123 (quoting Cane v. Worcester County, Md., 35 F.3d 921, 927 (4th Cir. 1994)).

Based on the foregoing, it is hereby

ORDERED that judgment be entered for plaintiffs on the issue of vote dilution in violation of § 2 of the Voting Rights Act of 1965.

IT IS FURTHER ORDERED that defendants shall have until **January 5, 2007**, to file remedial proposals consistent with this opinion for consideration by this court, and to brief the issue of whether defendants should be

permanently enjoined from enforcing Ordinance 122 in any further election.
Plaintiffs shall then have until **January 25, 2007**, to file any objections to
defendants' remedial proposals and to respond to defendants' brief on the
permanent injunction issue.  Defendants shall then have until **February 6,
2007**, to respond to plaintiffs' brief.

Dated December 5, 2006.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

49